E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
JEFF MITCHELL (Cal. Bar No. 236225)
Assistant United States Attorney
Major Frauds Section
RACHEL N. AGRESS (Cal. Bar No. 281703)
Assistant United States Attorney
International Narcotics, Money Laundering
 and Racketeering Section
DANIEL G. BOYLE (Cal. Bar No. 332518)
Assistant United States Attorney
Environmental Crimes and
 Consumer Protection Section
     1100/1300 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-0698/0487/2426
     Facsimile: (213) 894-6269
     E-mail:   jeff.mitchell@usdoj.gov
               rachel.agress@usdoj.gov
               daniel.boyle2@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 23-656-DMG |
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION REGARDING DEFENDANT SCOTT SIBELLA |
| v. | Sentencing Date: May 8, 2024 |
| SCOTT SIBELLA, | Sentencing Time: 3:00 p.m. |
| Defendant. | Location: Courtroom of the Hon. Dolly M. Gee |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Jeff Mitchell,

Rachel N. Agress, and Daniel G. Boyle hereby files its sentencing position with respect to defendant Scott Sibella.

This sentencing position is based upon the attached memorandum of points and authorities, the Presentence Report and Recommendation Letter, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: April 24, 2024              Respectfully submitted,

                                         E. MARTIN ESTRADA
                                         United States Attorney

                                         MACK E. JENKINS
                                         Assistant United States Attorney
                                         Chief, Criminal Division

                                         */s/ Jeff Mitchell*
                                         _____
                                         JEFF MITCHELL
                                         RACHEL N. AGRESS
                                         DANIEL G. BOYLE
                                         Assistant United States Attorneys

                                         Attorneys for Plaintiff
                                         UNITED STATES OF AMERICA

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

On January 24, 2024, defendant Scott Sibella ("defendant") pleaded guilty pursuant to a plea agreement to an information charging defendant with failure to file reports of suspicious transactions required to be made by casinos, in violation of 31 U.S.C. § 5318, 5322(a).

The United States Probation Office ("USPO") filed its Presentence Investigation Report (the "PSR") on April 3, 2024. (ECF No. 28.)  After acceptance of responsibility, the USPO calculated a total offense level of 6 and a criminal history category of I, yielding a Guideline range of zero to six months under the United States Sentencing Guidelines ("USSG" or the "Guidelines").  The USPO recommended a 12-month period of probation and a fine of $9,500, among other items.

Based on the terms of the plea agreement and as detailed further herein, the government concurs with the recommendation of the USPO.

**II.  STATEMENT OF FACTS**

**A.   Background on the Bank Secrecy Act**

The Bank Secrecy Act ("BSA"), codified at Title 31, United States Code §§ 5313-5326, as implemented through related federal regulations, was enacted by Congress to address criminal money laundering activities utilizing financial institutions.  To guard against money laundering through financial institutions, the BSA and its implementing regulations require domestic financial institutions to establish AML programs, including: the development of internal policies, procedures, and controls; the designation of a compliance

officer; an ongoing training program; and an independent audit function to test programs.

In particular, financial institutions that are casinos are required, under the BSA, to develop, implement and maintain an effective AML program, one reasonably designed to prevent casinos from being used to facilitate money laundering and one commensurate with the risks posed by the financial services provided by the casino.

Title 31, United States Code, Section 5318(g), and related regulations, require financial institutions, including casinos, to file with the Department of the Treasury a "Suspicious Activity Report" ("SAR") for any transaction conducted through the casino that involved at least $5,000 in funds, and the casino knew, suspected, or had reason to suspect that the transaction involved funds derived from illegal activity.

Under the BSA, SARs are to be filed with the Financial Crimes Enforcement Network ("FinCEN"), a bureau of the Department of the Treasury. The purpose of the SAR is to report known or suspected violations of law or suspicious activity observed by financial institutions subject to the regulations of the BSA, so that the information can be made available to law enforcement.[1] "In many instances, SARs have been instrumental in enabling law enforcement to initiate or supplement major money laundering or terrorist financing investigations and other criminal cases. Information provided in SAR forms also presents [FinCEN] with a method of identifying emerging

---

[1] See FinCEN, Guidance on Preparing a Complete & Sufficient SAR Narrative, available at https://www.fincen.gov/sites/default/files/shared/sarnarrcompletguidfinal_112003.pdf

trends and patterns associated with financial crimes. The information about those trends and patterns is vital to law enforcement agencies and provides valuable feedback to financial institutions." Id.

In addition, "[a]lthough any type of customer activity is potentially vulnerable to money laundering or terrorist financing, certain customers may pose specific risks," and FinCEN has explicitly warned casinos that a "[c]ustomer[] engaged in high value gambling that are inconsistent with a casino or card club's information about levels or sources of assets or incomes, or inconsistent with information about occupations in casino credit/marker account records (*e.g.*, credit/marker applications) or other records," should be viewed as a risk indicator.[2]

Finally, casinos have ongoing filing requirements when customers continue to frequent the casino and/or conduct additional suspicious activity. Specifically, FinCEN has specified that "[a]fter a casino or card club files a [SAR] it should report continuing suspicious activity with a report being filed at least every 90 days. This notifies law enforcement of the continuing nature of the activity and serves as a reminder to the organization that it must continue to review the suspicious activity to determine if other actions may be appropriate. This should continue even if a law enforcement agency has declined to investigate or there is knowledge that an investigation has begun, since the information contained in a [SAR]

---

[2] See FIN-2010-G002, Guidance Subject Casino or Card Club Risk-Based Compliance Indicators (June 30, 2010), available at https://www.fincen.gov/resources/statutes-regulations/guidance/casino-or-card-club-risk-based-compliance-indicators

may be of interest to other law enforcement agencies as well as gaming regulatory agencies."[3]

### B. Offense Conduct

At the time of entry of his guilty plea, defendant admitted to a nine-page factual basis. In essence, defendant admitted that he knew of the reporting requirements pursuant to the BSA which requires financial institutions, including MGM Grand, to file a SAR where the financial institution or its employees or executives knew or suspected the transaction involved funds derived from illegal activity.

In addition to the requirements pursuant to the BSA, MGM's AML Compliance Program required employees on the business and marketing side to affirmatively reach out to the compliance team in the event they observed suspicious activity. Specifically, MGM's AML Compliance Policy during the 2017 to 2019 period required that when an officer, employee, or agent of MGM Grand determined that a possible suspicious transaction had occurred, that individual was to complete either "a Suspicious Activity Incident Report, or a Suspicious Activity Report."

Defendant received trainings on the AML Compliance Policy in at least 2010 and 2014. In addition to knowledge of the BSA reporting requirements, defendant knew of the duty of someone in his position to report suspicious activity. Defendant was aware that Nix engaged in illegal bookmaking and continued to allow Nix to gamble at MGM

---

[3] See FIN-2009-G004 (September 30, 2009), available at https://www.fincen.gov/sites/default/files/shared/fin-2009-g004.pdf; See also FinCEN Suspicious Activity Report (FinCEN SAR) Electronic Filing Instructions, available at https://www.fincen.gov/sites/default/files/shared/FinCEN%20SAR%20ElectronicFilingInstructions-%20Stand%20Alone%20doc.pdf

Grand and other affiliate properties and suspected that certain customers of MGM Grand and/or affiliated properties placed large bets with the Nix Gambling Business. Also, when he was interviewed by law enforcement on January 10, 2022, defendant admitted that he believed Nix was involved in illegal sports bookmaking. Specifically, defendant admitted that he had "heard that Nix was in the booking business" and he "couldn't figure out how he had all the money he gambled with." Defendant further admitted "I didn't want to know because of my position, . . . in this business, they [bookies] are a dime a dozen. . . I stay out of it. If we know, we can't allow them to gamble. . . I didn't ask, I didn't want to know I guess because he wasn't doing anything to cheat the casino."

Despite being trained and having knowledge of his duty to do so, between approximately August 2017 and February 2019, defendant failed to report to MGM compliance personnel that Nix was an illegal sports bookmaker. Because of defendant's failure to report any suspicious activity by Nix to MGM's compliance personnel, MGM Grand, and its affiliate casino properties, failed to file SARs regarding Nix's Source of Funds and his illegal sports bookmaking, including a cash payment by Nix to MGM Grand of over $5,000 on or about July 27, 2018.

**III. THE PRESENTENCE REPORT**

The USPO calculated defendant's offense level as follows:

| | | |
|---|---|---|
| Base Offense Level: | 8 | USSG § 2S1.3(a)(1) |
| Proceeds of Unlawful Activity | +2 | USSG § 2S1.3(b)(1) |

(PSR ¶¶ 44-55.)  After two-point downward adjustments for acceptance of responsibility and zero-point offender, defendants' total offense level is 6.

The PSR calculated zero criminal history points for defendant, resulting in a criminal history category of I. (PSR ¶ 60.)  The government has no objections to the PSR's calculations.

**IV. THE GOVERNMENT'S GUIDELINES CALCULATION**

The government requests that the Court adopt the above factual findings and Guidelines calculations with respect to defendant.

**V. THE GOVERNMENT'S SENTENCING RECOMMENDATION**

Based on the factors set forth in 18 U.S.C. § 3553(a), the government recommends that the Court impose the following sentence, which the government submits is reasonable and appropriate here: a fine of $9,500[4]; a term of 12-months' probation; and a mandatory special assessment of $100.

**A. The Nature and Circumstances of The Offense and the History and Characteristics of the Defendant**

Section 3553(a)(1) provides that the Court shall consider the nature and circumstances of the offense and the history and characteristics of the defendant.

Here, the defendant was the president of one of the largest casinos in the Las Vegas, MGM Grand, a U.S. financial institution that engaged in high-risk, large volume cash transactions with an individual that defendant knew operated an illegal bookmaking

---

[4] As part of the Plea Agreement, the defendant agreed to recommend that defendant receive a fine in an amount no less than the high end of the applicable Sentencing Guidelines range, and not argue, or suggest in any way, either orally or in writing, that a lower fine amount be imposed.  See ECF No. 8, at ¶ 2(h).

6

business.  Not only did defendant know that Nix ran an illegal sportsbook, but defendant placed bets with the bookie and one of the bookie's agents.

To appropriately protect MGM Grand and the U.S. financial system, MGM was required to have an effective AML program that prevented MGM from being used to facilitate money laundering. Financial institutions are the gateway into the U.S. financial system for law-abiding citizens and sophisticated criminals alike.  An appropriate and effective BSA anti-money laundering program ensures the security and integrity of the individual financial institution and the broader U.S. financial system and ensure those institutions and the larger system are not exploited for the laundering of criminal proceeds.

Here, defendant's criminal conduct undermined MGM's policy and allowed Nix to introduce his illicit proceeds into the financial system.  Defendant knew his company, MGM, was required to have an effective AML program and to file SARs and knew that failure to file SARs on suspicious activity was a crime.  He also was aware that Nix engaged in illegal bookmaking by taking bets on sporting events. Instead of reporting Nix to the compliance department so that a SAR could be filed, defendant continued to allow Nix to gamble at MGM Grand and/or other affiliate properties – and caused MGM Grand to accept millions of dollars in high-risk, suspicious transactions without appropriate AML controls or the required SAR reporting.

Not only did defendant continue to allow Nix to gamble at MGM, but he authorized Nix to receive complimentary benefits at the casino, including meals, room, board, and golf trips with senior

MGM executives and other high net-worth customers to further encourage Nix to patronize the casino and/or other affiliated properties.  Nix used these golf trips to solicit customers for his illegal bookmaking business.

In mitigation, defendant is 61 old, and as the Guidelines recognize, courts may find that a sentence other than incarceration is appropriate, where a defendant's age and associated conditions would make incarceration more onerous and less necessary than for another offender.  In addition, defendant is no longer a casino president, which was the environment in which the crime occurred. Per defendant, he was terminated from employment at another large casino in Las Vegas due to this case.  (PSR ¶ 89.)  In addition, the negative publicity surrounding defendant's felony conviction for violating the Bank Secrecy Act serves as a deterrent for both defendant and others from engaging in similar conduct.

**B.   The Need for the Sentence Imposed**

Defendant accepted responsibility earlier than most defendants. Defendant waived his right to a grand jury and indictment, and pled guilty to an information early in the prosecution, thereby saving the government significant resources.  In addition, defendant also waived his right to a full and complete set of discovery.  These factors are not accounted for in the Guidelines; however, the Court can, and should, consider these factors under 3553(a). Indeed, consideration of these facts under 3553(a) will encourage defendants in the future to accept responsibility early and save additional government and judicial resources. Defendant's early acceptance of responsibility here is evidence of his respect for the law, which should be considered under 3553(a)(2).

## VI. CONCLUSION

For the foregoing reasons, the government requests that the Court adopt the Guidelines calculations from the Plea Agreement, and sentence defendant to the following: a fine of $9,500; a term of 12-months' probation; and a statutorily mandatory special assessment of $100.